UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 0 2017

RECEIVED

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    MAR - 0 2017

CLERK

ORIGINAL

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

```
------------------------------x
                             :
HARDING ADVISORY LLC and     :
WING F. CHAU,                :
                             :
            Petitioners,     :        Case No. 17-1070
                             :
      v.                     :
                             :
SECURITIES AND EXCHANGE      :
COMMISSION,                  :
                             :
            Respondent.      :
------------------------------x
```

## PETITION FOR REVIEW

Pursuant to 5 U.S.C. § 706, 15 U.S.C. § 78y, and Federal Rule of Appellate Procedure 15(a), Harding Advisory LLC ("Harding") and Wing F. Chau ("Chau," and collectively with Harding, "Petitioners") hereby petition this Court for review of all aspects of the final decision and order of the United States Securities and Exchange Commission (the "Commission"), captioned In the Matter of Harding Advisory LLC and Wing F. Chau, Opinion of the Commission, Admin. Proc. No. 3-15574 (January 6, 2017) ("Decision") and Order Imposing Remedial Sanctions, Admin. Proc. File No. 3-15574 (January 6, 2017) ("Order"). Petitioners attach the Decision and Order as Exhibits A and B to this petition.

Dated: March 6, 2017

Respectfully submitted,

**BROWN RUDNICK LLP**

By: _____

Kenneth B. Weckstein
601 Thirteenth Street NW
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
kweckstein@brownrudnick.com

&

Alex Lipman
Ashley L. Baynham
Justin S. Weddle
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
alipman@brownrudnick.com
abaynham@brownrudnick.com
jweddle@brownrudnick.com

*Attorneys for Petitioners Harding Advisory LLC and Wing F. Chau*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR - 6 2017

RECEIVED

# UNITED STATES COURT OF APPEALS
## FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    MAR - 6 2017

CLERK

```
-----------------------------------x
                                    :
HARDING ADVISORY LLC and            :
WING F. CHAU,                       :
                                    :
              Petitioners,          :     Case No. 17-1070
                                    :
        v.                          :
                                    :
                                    :
SECURITIES AND EXCHANGE             :
COMMISSION,                         :
                                    :
              Respondent.           :
-----------------------------------x
```

ORIGINAL

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and this Court's Rule 26.1, Petitioner Harding Advisory LLC ("Harding") respectfully submits the following corporate disclosure statement. Harding is a Florida corporation. As relevant to the litigation, Harding is a registered investment adviser. Harding has no parent company and no publicly-held corporation owns 10% or greater ownership in Harding.

Dated: March 6, 2017

Respectfully submitted,

**BROWN RUDNICK LLP**

By:

Kenneth B. Weckstein
601 Thirteenth Street NW
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
kweckstein@brownrudnick.com

&

Alex Lipman
Ashley L. Baynham
Justin S. Weddle
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
alipman@brownrudnick.com
abaynham@brownrudnick.com
jweddle@brownrudnick.com

*Attorneys for Petitioners Harding Advisory*
*LLC and Wing F. Chau*

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAR – 6 2017

RECEIVED

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED   MAR – 6 2017

CLERK

```
——————————————————x
                                  :
HARDING ADVISORY LLC and          :
WING F. CHAU,                     :
                                  :
                                  :
              Petitioners,        :        Case No.  17-1070
                                  :
                                  :
       v.                         :
                                  :
                                  :
SECURITIES AND EXCHANGE           :
COMMISSION,                       :
                                  :
                                  :
              Respondent.         :
——————————————————x
```

## CERTIFICATE OF SERVICE

I hereby certify that on March 6, 2017, I caused true and correct copies of

the foregoing Petition for Review and Orders to be served in the following manner

on the persons below:

By UPS and Fax (202-722-9324)
Mr. Brent J. Fields, Secretary
Office of the Secretary
Securities and Exchange Commission
100 F Street, N.E., Mail Stop 1090
Washington, D.C. 20549

By UPS and email
Mr. Howard Fischer
Associate Regional Director
New York Regional Office
Securities and Exchange Commission
200 Vesey Street, Suite 400
New York, NY 10281
FischerH@SEC.gov

Dated: March 6, 2017

Respectfully submitted,

**BROWN RUDNICK LLP**

By: _____

Kenneth B. Weckstein
601 Thirteenth Street NW
Washington, D.C. 20005
Telephone: (202) 536-1700
Facsimile: (202) 536-1701
kweckstein@brownrudnick.com

&

Alex Lipman
Ashley L. Baynham
Justin S. Weddle
Seven Times Square
New York, New York 10036
Telephone: (212) 209-4800
Facsimile: (212) 209-4801
alipman@brownrudnick.com
abaynham@brownrudnick.com
jweddle@brownrudnick.com

*Attorneys for Petitioners Harding Advisory*
*LLC and Wing F. Chau*

SECURITIES AND EXCHANGE COMMISSION
Washington, D.C.

SECURITIES ACT OF 1933
Release No. 10277 / January 6, 2017

INVESTMENT ADVISERS ACT OF 1940
Release No. 4600 / January 6, 2017

INVESTMENT COMPANY ACT OF 1940
Release No. 32415 / January 6, 2017

Admin. Proc. File No. 3-15574

---

In the Matter of

HARDING ADVISORY LLC and
WING F. CHAU

---

OPINION OF THE COMMISSION

INVESTMENT ADVISER PROCEEDING

CEASE-AND-DESIST PROCEEDING

**Grounds for Remedial Action**

**Fraud**

A registered investment adviser and its principal violated Section 17(a) of the Securities Act of 1933 and Sections 206(1) and (2) of the Investment Advisers Act of 1940 in selecting assets for certain collateralized debt obligations ("CDOs") that it managed. *Held*, it is in the public interest to bar principal with a right to reapply after five years for permission to associate, revoke the investment adviser's registration, order disgorgement of $5,775,635.61, plus prejudgment interest, jointly and severally, and order the investment adviser to pay two civil penalties of $425,000 each, or $850,000 total, and the principal to pay two civil penalties of $85,000 each, or $170,000 total.

APPEARANCES:

*Alex Lipman* and *Ashley Baynham*, Brown Rudnick LLP, for Harding Advisory LLP and Wing F. Chau

*Howard A. Fischer* and *Andrew M. Calamari*, for the Division of Enforcement.

2

Initial decision filed: January 12, 2015
Respondents' petition for review filed: February 3, 2015
Division of Enforcement's cross-petition for review filed: February 12, 2015
Last brief received: November 5, 2015


Harding Advisory LLC ("Harding"), a registered investment adviser, and Wing F. Chau, Harding's principal, appeal from an administrative law judge's initial decision[1] finding that Respondents committed fraud in connection with Harding's selection of assets for certain collateralized debt obligations ("CDOs") that it managed. The Division of Enforcement cross-appeals from the law judge's dismissal of addition alleged violations. We base our findings on an independent review of the record, except with respect to those findings not challenged on appeal.

## I. Background

This case concerns two CDOs—Octans I CDO Ltd. ("Octans") and Norma CDO I ("Norma"). A CDO is a structured vehicle created for the purpose of issuing securities backed by a collection of assets. CDOs typically are a compilation of hundreds of Residential Mortgage-Backed Securities ("RMBS")—investment vehicles that pool thousands or tens of thousands of individual residential mortgage loans. Harding served as collateral manager for Octans. Harding purchased assets from Norma to include in other Harding-managed CDOs.

### A.   Harding

In 2006, Chau established Harding as a Delaware LLC and registered it as an investment adviser pursuant to the Advisers Act.[2] During 2006 and 2007, Harding was among the world's largest managers of CDOs, managing twenty-one CDOs backed by over $20 billion in residential mortgages. Harding mostly managed "mezzanine" or "subprime" CDOs, meaning that they were backed by residential mortgages with high risks of default.

As a collateral manager, Harding relied on investment banks for asset management opportunities. For managed CDOs, the underwriting investment bank chose the manager, and the manager selected assets consistent with the bank's blueprint for the deal.

Like other collateral managers, Harding made its money through the collection of management fees. Harding only collected fees for managing a CDO when the CDO closed, and if a CDO failed, Harding stopped receiving fees.

---

[1]     *Harding Advisory LLC*, Initial Decision Release No. 734, 2015 WL 137642 (Jan. 12, 2015).

[2]     Chau is a 99% owner of Harding, and his wife owns the remaining 1%.

3

### B.     Merrill

Merrill Lynch & Co., Inc., structured and marketed most of the CDOs Harding managed.[3] Prior to June 2006, all of Harding's management fees were earned from CDOs Merrill structured, and in the second half of 2006 and 2007, Merrill continued to underwrite many of Harding's CDOs.  In total, Harding received approximately $42.5 million in fees from these deals.

### C.     Magnetar

Between May 2006 and July 2007, Magnetar Capital LLC, a hedge fund based in Evanston, Illinois, partnered with nine different investment banks, including Merrill, to create approximately thirty subprime CDOs, including Octans and Norma.  Magnetar established these CDOs by committing to purchase the riskiest assets—the equity tranche.  CDOs typically issued notes in a senior/subordinated structure through tranches of varying credit rating and yield.  The senior tranches, beginning with the highest rated tranche—generally rated AAA (Aaa)—assumed the lowest risk of default as well as the lowest interest rate.  The subprime or mezzanine tranches, which generally received ratings of BBB (Baa2) to BBB- (Baa3), fell below the senior notes.  The equity tranche, which was typically unrated, generally assumed the highest risk of default as well as payments based on the residual cash flow remaining after the rated tranches received their interest payments.  When Magnetar entered the market in 2006, few investors were willing to invest in equity, and banks were reluctant to create new CDOs without first securing an equity purchaser.

While the housing market held, the CDOs created high-yielding equity tranches. Magnetar was motivated to invest in CDO equity because the cash flow profile was "very stable" and high in the early years of the portfolio, even if the portfolio deteriorated in later years.  In late 2006 and early 2007, Magnetar apparently used the steady income flow from its equity investments to finance corresponding short positions in the CDOs.  Generally speaking, Magnetar profited from its short positions in CDOs, although it is not clear if it profited from Octans, which was an early CDO deal in which it held a net long position—its equity investment in Octans far exceeded the protection it purchased on rated tranches of the deal.  The record suggests that the CDO industry was generally aware of Magnetar's strategy by the end of 2006.

On or around May 11, 2006, Magnetar and Merrill agreed to collaborate on a series of mezzanine CDOs.  Per the agreement, Magnetar and Merrill would pick "mutually agreeable"

---

[3]     Merrill collaborated with Harding to create at least eleven CDOs, including Octans, and acted as underwriter to Chau's and Harding's first CDO, Jupiter High-Grade CDO I.

4

collateral managers, and Magnetar would play a significant role in structuring the CDO portfolios. Merrill ultimately created four CDOs with Magnetar, including Octans and Norma.[4]

## II. Octans

### A.     Facts

Octans was Harding's first mezzanine CDO and its first encounter with Magnetar. In May 2006, Magnetar and Merrill selected Harding as collateral manager for the deal, and Merrill engaged Harding in the role. Harding, Merrill, and Magnetar then entered into the warehouse agreement that would govern the acquisition of the collateral for Octans.

#### 1.     The warehouse agreement

Under the agreement, Harding would select qualifying RMBS with BBB and BBB-ratings, Merrill would purchase and warehouse the assets prior to closing, and Magnetar would assume the risk of first loss on the assets during the warehouse period. As was customary in the industry, the warehouse agreement provided that Magnetar—as the party assuming the warehouse risk—had the right to review Harding's collateral selection before purchase.

At Magnetar's suggestion, Harding followed a strategy to purchase the ABX Index—an index reflecting the twenty most liquid RMBS in the market at each credit level—at the BBB and BBB- levels and short any individual bonds on the Index that it rejected during its credit review. Magnetar did not encourage Harding to reject any particular bonds from the Index. It neither asked Harding to include any specific bonds in Octans nor objected to any of Harding's collateral selections. Likewise, Magnetar did not ask Harding to alter or compromise its credit review standards to exclude assets it would have normally approved or include assets it would have otherwise rejected. Rather, Harding was to select or reject each bond listed at the BBB or BBB- level of the ABX Index based on its review of the creditworthiness of the bond. Because in May 2006, the individual bonds were trading at higher prices than reflected in the index as a whole, this strategy exploited the difference between the spread of the ABX index and the average spread of the cash bonds referenced in the Index.

As agreed, Harding's credit analysts, led by senior analyst Jung Lieu, reviewed each of the forty bonds at the BBB and BBB- levels of the ABX Index (twenty at each level) and sent its selections to Merrill and Magnetar on May 31, 2006. Magnetar accepted the list without objection.

---

[4]     On December 12, 2013, Merrill agreed to pay $131.8 million to settle allegations that it failed to disclose Magnetar's involvement in creating Octans and Norma. The managing partners for NIR Capital Management LLC, the firm Merrill engaged to manage Norma, also settled charges that they allowed Magnetar to influence asset selection and abdicated their duty to pick only the assets they believed were best for their client.

5

### 2.    The offering documents

Merrill, as the party marketing the deal, primarily drafted the offering documents for Octans, including the Pitch Book, Offering Circular, and Collateral Management Agreement ("CMA").[5] The offering documents did not disclose Magnetar's participation in the deal. But it was common practice at the time for CDO underwriters to omit the names of large investors from CDO marketing materials.

The Pitch Book was circulated to potential investors in August 2006. It described the structure of the proposed CDO, including the expected portfolio composition, the collateral assumptions, and the risk factors. The Pitch Book also provided background on Harding, including its investment philosophy and process and its portfolio surveillance and monitoring process. In bullet points under the "Investment Philosophy and Process" section, the Pitch Book stated that Harding would "Employ[] a Disciplined Bottom/Up Credit and Structural Analysis" for asset selection and "[s]tress[] each transaction under extreme interest rate and prepayment rate assumptions to capture the tolerance for losses of the underlying collateral pool." It further stated that Harding sought to devise "a collaborative, methodical and disciplined investment process to identify potential credit and structural issues and proposed investments."

The Offering Circular, as well as the CMA, which Harding signed, stated that Harding would perform its obligations "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing relating to assets of [like] nature and character." The Offering Circular was sent to investors on September 20, 2006.

### 3.    The closing

Prior to closing, Merrill formed the issuer, Octans I CDO Ltd., a Cayman Islands Special Purpose Vehicle ("SPV"), for the purpose of executing the closing documents, including the CMA, purchasing the collateral from the warehouse, and issuing Octans's debt securities. The issuer was made aware of Magnetar's equity position and role in the warehouse agreement, and had an opportunity to review that agreement and other proprietary deal documents, prior to closing. The CMA was executed between the issuer and Harding on September 26, 2006.

Prior to closing, Harding and Chau also reviewed each asset in the Octans portfolio again to assure that all complied with the Eligibility Criteria and certified to that effect.

Merrill closed Octans, a $1.5 billion CDO, on September 26, 2006. As the housing market deflated rapidly beginning in early 2007, Octans's collateral, which consisted mainly of

---

[5]    Harding drafted portions of the offering documents that pertained to its role as collateral manager in the transactions and submitted those sections to Merrill for inclusion in the offering documents.

subprime bonds, suffered heavy default rates. By April 2008, the CDO had defaulted, resulting in roughly $1.1 billion of losses for its outside investors.

**B.      Procedural History**

On October 18, 2013, an Order Instituting Proceedings ("OIP") charged Respondents with defrauding Octans's investors in three ways. First, the OIP described a deliberate fraud whereby Respondents succumbed to pressure from Magnetar to select assets for Octans that Harding's analysts "disfavored" because Magnetar stood to profit from Octans's failure as a result of the short positions it maintained in Octans. According to the OIP, Respondents acquiesced to curry favor with Magnetar and Merrill even though they would have excluded those assets from the portfolio under Harding's credit review process. Second, the OIP alleged that Respondents' failure to disclose in the Pitch Book and Offering Circular that Magnetar was a party to the warehouse agreement with the right to "veto" assets Harding selected made those documents "materially misleading." Third, the OIP alleged that Respondents misrepresented their asset selection process in the Pitch Book and misrepresented that Harding would select assets "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing" in the Offering Circular and CMA.

The ALJ issued an initial decision dismissing most, but not all, of the charges. The initial decision found that the record did not support any knowing or reckless violations, that Magnetar did not pressure Harding to compromise its credit standards or select assets that Harding disfavored, and that Magnetar did not stand to profit from Octans's failure. The initial decision also found that Harding was not negligent in its failure to disclose Magnetar's role in the warehouse agreement. But the initial decision concluded that Harding negligently misrepresented the standard of care it would follow in selecting assets for Octans. Accordingly, the ALJ held Harding liable for violating the antifraud provisions of Section 17(a) of the Securities Act of 1933 and Section 206(2) of the Investment Advisers Act of 1940.

Both the Division of Enforcement and Respondents filed petitions for review. The Division argues that the ALJ erred in not holding Respondents liable due to a conflict between Harding's duty to the issuer and its influence by Magnetar and its failure to disclose Magnetar's participation and role in the asset selection. Respondents argue that the record does not support the ALJ's finding that they negligently misrepresented the standard of care.

**C.      Analysis**

We dismiss all charges related to Octans. We agree with the ALJ, based on our independent de novo review, that the record does not support the Division's theory that Harding knowingly or recklessly compromised its independent judgment to select undesirable assets that favored Magnetar's short position. The record indicates that, despite modest short positions, Magnetar was net long in Octans and that its financial interests were generally aligned with other debt investors in the CDO. We also find that the omission of Magnetar's involvement in the

7

warehouse agreement from the offering documents was not fraudulent. We find further that the Division failed to establish that Harding negligently misrepresented the standard of care it would follow in selecting assets for Octans. To the extent that the Division's expert witness articulated a standard of care, the record demonstrates that Harding satisfied that standard.

### 1.     Conflict of Interest

Advisers Act Sections 206(1) and 206(2) prohibit an investment adviser from employing a device, scheme, or artifice to defraud a client or from engaging in any transaction, practice, or course of business that operates as a fraud or deceit on a client.[6] Harding, as a registered investment adviser under the Advisers Act, owed a fiduciary duty to clients, including issuers of CDOs it managed.[7] The Division argues that Harding violated Advisers Act Section 206 and its fiduciary duties by doing Magnetar's bidding at the expense of its client—the Octans issuer.

Like the ALJ, but based on our independent review of the record, we reject the Division's theory that Harding, motivated to facilitate its blossoming relationship with Magnetar, selected assets for Octans that its own analysts "disfavored." The Division's theory relies on the premise that Respondents, at Magnetar's behest, selected assets that Harding's analysts believed would perform poorly because those assets would benefit Magnetar. There is insufficient evidence that Respondents were influenced by Magnetar's involvement or selected assets for Octans out of deference to Magnetar.

The Division urges that Harding was incentivized to please Magnetar because it relied on Merrill for business and Merrill relied on Magnetar to sponsor CDOs. But evidence in the record does not establish that Merrill or Magnetar improperly influenced Harding's selection of assets for Octans in violation of Section 206. Harding was not a party to the business arrangement between Merrill and Magnetar in the Spring of 2006 to collaborate on a series of mezzanine CDOs with "mutually agreeable [collateral] managers." Per that arrangement, Magnetar and Merrill agreed on a blueprint for Octans and selected Harding to manage the deal. There is no evidence that Harding campaigned for the business or was promised more business in exchange for allowing Magnetar to dictate the assets in the CDO. To the contrary, Magnetar did not challenge any of the assets selected by Harding. Nor is there evidence of undue influence by Magnetar to corrupt Harding's credit process in the ABX Index trade. There is no evidence that Magnetar pressured Harding to alter its credit review standards or to select a larger number of assets. All of the evidence suggests that Magnetar left it to Harding to decide which and how many bonds to include.

---

[6]      15 U.S.C. § 80b-6.

[7]      *See Transamerica Mortg. Adviser, Inc. v. Lewis*, 444 U.S. 11, 17 (1979); *SEC v. Capital Gains Research Bureau, Inc.*, 375 U.S. 180, 191–94 (1963) (investment advisers have an "affirmative duty of 'utmost good faith, and full and fair disclosure of all material facts'").

8

Likewise, the record does not support the Division's premise that Respondents selected assets for Octans that they believed would perform poorly to Magnetar's unique benefit. Despite the Division's claim that Magnetar's interests in Octans "were not aligned" with those of other debt investors, Magnetar's equity investment in Octans far exceeded the protection it purchased on rated tranches of the deal. Specifically, Magnetar purchased $94 million in equity and $48 million in hedges against rated tranches. Magnetar thus had an economic interest in the underlying bonds continuing to be able to make payments to CDO investors in all tranches. Indeed, Octans was among Magnetar's first deals, and it appears from the record that it intended to hold the equity for several years and profit from its high returns. After May 2006, when the spread between ABX Index bonds and non-ABX Index bonds tightened, Magnetar apparently grew more aggressive in urging managers to approve ABX Index assets. But nothing in the record suggests Magnetar pressured Harding to approve additional assets for Octans in May 2006.

Similarly, the ABX Index strategy Magnetar proposed was not understood at the time to be detrimental to the investors or issuers. All interested parties believed that the ABX Index purchase would generate higher spreads for Octans. Harding, per the warehouse agreement, selected which bonds to include from the ABX Index based on its credit analysis.

Finally, to the extent that any conflict existed, that conflict was disclosed to the issuers prior to closing. The issuers were made aware of Magnetar's specific involvement in the deal. Prior to closing, the issuers had an opportunity to review the collateral, the investment criteria, the warehouse agreement, and all marketing materials.

## 2.     Failure to Disclose

Securities Act Section 17(a) prohibits, among other things, the offer or sale of securities by means of a material misstatement or omission of material fact.[8] The Division contends that Harding violated Section 17(a) because the Octans offering documents did not disclose that Magnetar was a party to the warehouse agreement and had a right to review the collateral. We dismiss this claim because the Division failed to prove that the omitted information was material.

For a misstatement or omission to qualify as material, "there must be a substantial likelihood that the disclosure of the omitted fact would have been viewed by [a] reasonable investor as having significantly altered the 'total mix' of information made available."[9] That is, an omitted fact is not material unless, "under all the circumstances," it "would have assumed actual significance in the deliberations of the reasonable shareholder."[10]

---

[8]      15 U.S.C. § 77q(a).

[9]      *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449 (1976).

[10]     *Id.*

9

"The question of materiality . . . is an objective one, involving the significance of an omitted or misrepresented fact to a *reasonable* investor."[11] The "reasonable investor," however, would interpret a statement to account for the "customs and practices of the relevant industry" and "as appropriate, in a broader frame."[12] A statement is not misleading unless it would "conflict with what a reasonable investor would take from the statement itself."[13]

In this case, the Division has failed to establish that the disclosure of Magnetar's unexercised rights in the selection of the warehouse assets would have significantly altered the "total mix" of information available to a reasonable investor. It was common practice for equity purchasers of CDOs to assume some risk during the warehouse period and reserve the right to review collateral selections. The Octans investors were all sophisticated parties—mostly hedge funds and affiliates of large investment banks—and a review of the testimony presented demonstrates that they expected the equity purchaser in the deal to have had rights during the warehouse period.[14]

Indeed, the only investor whom the Division called at the hearing, Ken Doiron, agreed that Magnetar's right to review collateral selections would not have significantly altered the total mix of information. Other investors concurred that disclosure of Magnetar's involvement would not have assumed actual significance in their deliberation. For example, Michael Edman, who invested in Octans on behalf of Morgan Stanley, testified that he did not find it unusual that Magnetar was a party to the Octans warehouse agreement because, as the equity purchaser, he expected Magnetar to take some risk in the warehouse. He did not believe Magnetar's role in the warehouse or Magnetar's prior notice by Merrill and Harding of assets selected for Octans would have influenced his investment decisions. Another investor stated, "It is not important to disclose the identity of a party to a [warehouse agreement] if that party is merely providing warehouse funding, and its only involvement is the right to veto assets."

Moreover, even though the offering materials did not disclose that Magnetar was the equity purchaser for the deal, most of the investors were likely aware that Magnetar was a major

---

[11]    *Id.* at 445 (emphasis added).

[12]    *Omnicare, Inc. v. Laborers Dist. Council Const. Indus. Pension Fund*, 135 S. Ct. 1318, 1330 (2015) ("[A]n investor reads each statement within such a document . . . in light of all its surrounding text, including hedges, disclaimers, and apparently conflicting information. And the investor takes into account the customs and practices of the relevant industry. So an omission that renders misleading a statement of opinion when viewed in a vacuum may not do so once that statement is considered, as is appropriate, in a broader frame.").

[13]    *Id.* at 1329.

[14]    *See Tongue v. Sanofi*, 816 F.3d 199, 211 (2d Cir. 2016) (noting that the "[p]laintiffs are sophisticated investors" who were "well accustomed to the 'customs and practices of the relevant industry'") (quoting *Omnicare*, 135 S. Ct. at 1330).

equity purchaser in the market at that time. For example, one investor testified that he was aware that Magnetar was purchasing equity and shorting tranches in the CDO market in 2006 and believed other market participants would have been aware of Magnetar's presence and strategy too. He added that Magnetar's presence was of little concern because his firm would have all the information on the assets it needed and would perform its own analysis on those assets.

### 3.    Standard of Care for Selecting Assets

At the hearing before the ALJ, the Division argued that Respondents violated Section 17(a)(2) of the Securities Act and Section 206(2) of the Advisers Act by materially misstating the standard of care for selecting assets in the Octans offering documents in two ways. First, the Division argued that Harding represented—in the Offering Circular and CMA—that it would follow an industry standard of care that materially exceeded the standard of care Harding actually used in selecting assets. Second, the Division argued that Harding failed to adhere to the standard of care articulated in the Pitch Book. The Division's theory was that Harding's analyst, Jung Lieu, was negligent in selecting assets for Octans. The Division's expert, Ira Wagner, testified that Lieu's credit analysis fell below the standard of care articulated in the Octans offering documents. Although the ALJ found that there was no deliberate fraud, he relied on Wagner's testimony to find that Harding[15] had negligently misrepresented the standard of care it would follow in selecting assets for Octans.[16]

### a.    *Industry Standard of Care (Offering Circular & CMA)*

We find that the Division failed to establish that Harding departed from an industry standard of care. The Offering Circular and the CMA stated that Harding would perform its obligations "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing relating to assets of [like] nature and character." Although the standard of care to which an investment adviser is held is not necessarily defined by customary industry practice,[17] the Division alleges that Harding misrepresented that it would select assets "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing." The Division

---

[15]    The ALJ found that Chau was neither primarily liable for Harding's violation nor caused or aided and abetted Harding's violation.

[16]    Scienter is not required for a violation of Section 17(a)(2) of the Securities Act or Section 206(2) of the Advisers Act; negligence is sufficient. *Aaron v. SEC*, 446 U.S. 680, 695–96 (1980); *Steadman v. SEC*, 967 F.2d 636, 643 n.5 (D.C. Cir. 1992).

[17]    *See Monetta Fin. Servs., Inc. v. SEC*, 390 F.3d 952, 956 (7th Cir. 2004); *see also SEC v. Dain Rauscher, Inc.*, 254 F.3d 852, 857 (9th Cir. 2001) ("The industry standard is a relevant factor, but the controlling standard remains one of reasonable prudence."); *Newton v. Merrill, Lynch, Pierce, Fenner & Smith, Inc.*, 135 F.3d 266, 274 (3d Cir. 1998) (noting that "a universal industry practice may still be fraudulent") (citing caselaw).

11

had the burden of establishing the standard of care, as defined by customary industry practice, and proving that Respondents selected assets in violation of it. The Division failed to do so.

In arguing that Harding (through Lieu) selected assets with a degree of care that fell below the industry standard, the Division relied on the testimony of its expert, Ira Wagner, to define an accepted industry standard of care that institutional CDO managers of "national standing" must follow in selecting assets. But as the ALJ acknowledged, Wagner struggled to articulate concrete industry standards.[18] At most, Wagner testified that the industry standard of care required some cash flow analysis of each security a CDO manager considered and approved. He testified that performing stress case cash flow runs was an industry standard and should be performed for each bond. The Division did not present any other evidence to establish an industry standard of care. Indeed, the record suggests that institutional review of subprime assets varied dramatically at the time due to the complexity of the analysis, the opacity of the securities, and the fluidity of the underlying assumptions.

The record does not support a finding that Respondents violated the standard of care Wagner articulated. The ABX Index reflects the twenty most liquid RMBS in the market at each credit level. Of the forty ABX Index bonds at the BBB and BBB- levels, Harding analysts performed cash flow runs for at least thirty-nine within the ten days leading to Lieu's decisions on May 31, 2006. Lieu had access to all of those runs as part of her review. The fortieth bond, for which no cash flow run records have been located, was approved by both Lieu and another senior analyst, Jamie Moy, on May 22, 2006, and had been approved several times before that, indicating that some testing would have been performed by either Lieu or Moy during this time.

Furthermore, Lieu rejected several of the ABX Index bonds during the Octans review. On May 31, 2006, Lieu sent Magnetar a list of twelve ABX Index bonds that Harding was not willing to accept. The list included four BBB bonds and eight BBB- bonds, leaving twenty-eight bonds out of the forty ABX Index bonds that Harding's credit department approved.

To support its argument that Lieu's review was substandard, the Division points to a spreadsheet of certain cash flow analyses prepared by a junior analyst at Harding, Brett Kaplan, on May 31, 2006. The spreadsheet indicates substantial write-downs on eleven of the twenty-eight bonds Lieu approved. But nothing indicates that Lieu relied on that spreadsheet to support her credit determinations or was required to do so. Indeed, as Wagner conceded, the spreadsheet contained flaws that would have been facially apparent to an experienced analyst like Lieu. And Lieu testified that she discarded the flawed spreadsheet and ran a new analysis. In any event, the spreadsheet does not support the Division's theory that Harding's review fell below the industry standard of care. Wagner testified that the industry standard of care required some cash flow

---

[18]     *See Harding*, 2015 WL 137642, at *51 (explaining that Wagner "did not identify exactly what '[the] industry standards' entail for collateral managers").

12

analysis of each bond. The existence of a contemporaneous spreadsheet containing cash flow analyses on the Octans bonds shows that Harding was doing just that.

Harding's role in selecting and reviewing assets for Octans also appears to have extended well beyond the actions of a single asset manager on a single day. It is undisputed that, prior to closing, Harding and Chau reviewed each asset in the Octans portfolio to assure that all complied with the Eligibility Criteria and certified to that effect. The Division does not argue that this pre-closing asset review fell below the industry standard of care or that any of the assets in the Octans portfolio failed to comport with all eligibility and investment criteria.

### b.    Harding's Standard of Care (Pitch Book)

For similar reasons, we find that the Division failed to establish that Harding negligently departed from the standard of care articulated in the Octans Pitch Book. The Pitch Book, which was circulated to potential investors, stated that Harding's "Investment Decision, Process and Execution has Been Built Around . . . a collaborative, methodical and disciplined investment process," and indicated that Harding would "[s]tress[] each transaction under extreme interest rate and prepayment rate assumptions to capture the tolerance for losses of the underlying collateral pool." The Division failed to prove that Harding's asset selection process for Octans departed from the description in the Pitch Book in any material way.

The Division claims that the Pitch Book misrepresented that Harding applied a "collaborative" investment process. Although it is unclear from the record the extent to which Harding's analysts may have communicated with each other about their concurrent reviews, the evidence suggests that Lieu and Moy collaborated, and that Lieu collaborated with other members of Harding's staff, especially considering that the credit analysts shared a work space and may have communicated in person. The existence of a spreadsheet prepared by Brett Kaplan (a junior analyst) on May 31, 2006, indicates that, at the very least, Lieu was communicating with him about the bonds on that date. The spreadsheet also illustrates that Harding performed stress tests on the bonds around that time. Indeed, the ALJ stated, and the evidence demonstrates, Harding and Lieu generally complied with the expectation that it would evaluate credit enhancement and structural protection based on expected loss scenarios relevant for the particular asset class and collateral profile. Moreover, prior to closing, a re-assessment of all assets in the portfolio was undertaken. As such, if Lieu's review on May 31, 2006 fell below the standard of care articulated in the Pitch Book, the errors would have been cured at the end of the vetting process, just prior to closing, when Harding re-analyzed all of the assets in the Octans portfolio and certified to their compliance with the eligibility criteria for the CDO. The Division's burden was to show a negligent departure from the standard of care as articulated by Harding in its materials. In examining the evidentiary record—including the timeline and process of vetting assets for inclusion in the CDO—the Division did not meet its burden of proving that Harding negligently departed from the standard articulated in the Pitch Book.

To the extent the record indicates any departure from the description of the asset selection process in the offering documents, it was a minor departure of a limited duration in time and did not taint the entire selection process. In fact, the asset selection process culminated only after a pre-closing re-assessment of the assets in the Octans portfolio. Under these circumstances, a minor departure from the standard of care articulated in the Pitch Book would not have "assumed actual significance in the deliberations of a reasonable [investor]."[19]

\*       \*       \*

For these reasons, we dismiss the charges entirely as they relate to Octans.

### III. Norma

**A.     Facts**

Norma was a mezzanine CDO managed by NIR Capital Management and structured by Merrill, with Magnetar as the equity investor. Harding was not the collateral manager of Norma; rather, in January 2007 it purchased Norma bonds to allocate to other CDOs that it managed. Whereas Chau was not directly involved in the selection of assets for Octans, the record establishes that he almost exclusively drove Harding's purchase of Norma bonds.

Chau agreed to purchase the A-rated tranche of Norma around January 19, 2007, but he was reluctant to acquire the BBB-rated tranche because he believed that Norma was structured to disfavor mezzanine noteholders. He reached this conclusion after Merrill sent him the marketing materials on Norma, including a term sheet and Pitch Book, and he determined that the "turbo structure" of the deal was "very weak," meaning that the CDO was designed to divert cash flow from the debt investors to the equity investors, to the particular detriment of the mezzanine investors. Nonetheless, Chau reluctantly agreed to purchase over 30% of Norma's BBB-tranche after receiving repeated overtures from Merrill and Magnetar for Harding to do so.

For example, on January 23, 2007, Jim Prusko of Magnetar sent an internal email stating that Merrill was having trouble placing Norma BBBs but that Andy Phelps (from Merrill) "to his credit [had been] very aggressive, sounds like he will use his clout to stuff people with them, will stick baa3's in cdo2's in their pipeline," and Prusko promised that he "will personally hammer wing [chau], he's getting too big for his britches." Two minutes later, Prusko wrote an email to Chau titled "Pls buy some norma bbb," and in the body of the email, wrote, "Stop complaining about Turbo [smiling face emoticon] . . . Remember who was there for u when u were a little guy." Chau replied that he had already committed to purchase Norma A-rated bonds in an unsuccessful effort to appease Prusko and curb further pressure from Magnetar and Merrill. On January 24, 2007, after Andy Phelps from Merrill emailed Chau to ask if he had "sharpened [his]

---

[19]     *TSC Indus.*, 426 U.S. at 449.

pencil on [N]orma BBBs" yet, Chau replied, "I never forget my true friends."  That same day, Chau agreed to purchase $20 million in BBB-rated bonds, but expressed his preference to purchase a smaller amount.  Ultimately Merrill decreased Harding's BBB allocation to $15 million, and Chau emailed back, "Now that's what I'm talking about, the love is in the air."

About a week before Norma closed, Chau received an in-depth commentary on Norma from one of Harding's analysts with a negative assessment of the BBB-rated bonds.  The commentary noted that many of the bonds underlying the BBB tranche raised significant red flags and predicted that the investment would be hit with losses.  Harding nonetheless purchased the Norma BBB-rated bonds and, after Norma closed on March 1, 2007,  allocated them to two Harding-managed CDOs—Lexington Capital Funding V Ltd. ("Lexington"), which closed on March 29, 2007, and Neo CD 2007-1 ("Neo"), which closed on April 5, 2007.

Harding's offering circulars and CMAs for Lexington and Neo represented that Harding would exercise reasonable care in selecting assets.  Specifically, Harding represented that it would perform its obligations using the degree, skill, and attention that it would exercise with respect to comparable assets that it managed for itself or for others and "in a manner consistent with the customary standards, policies and procedures followed by institutional managers of national standing relating to assets of [like] nature and character."  Norma eventually defaulted on the BBB-rated bonds that Harding allocated to Lexington and Neo.

**B.    Procedural History**

The OIP charged Respondents with committing fraud by acquiring the Norma tranches as a favor to Merrill and Magnetar and to the detriment of Lexington and Neo and their debt investors.  The ALJ found that Respondents had an undisclosed material conflict of interest between their desire to please Merrill and Magnetar and their duty to their clients (Lexington and Neo), in violation of Section 206(1) and Section 17(a)(1); and materially misrepresented, in each client's CMA, the standard of care Harding followed in selecting Norma BBB-rated bonds for each client's portfolio, in violation of Section 206(1) and Section 17(a)(1).  In their petition for review, Respondents argue that the issuers were in no way defrauded because they had all information available to them at the time of closing.

**C.    Analysis**

The record establishes that Respondents agreed to purchase the BBB-rated Norma tranche as a favor to Merrill and Magnetar and allocated those bonds to Lexington and Neo without regard for the creditworthiness of the assets.  Accordingly, we find that Respondents abdicated their duty to pick only the assets they believed were best for their clients—the issuers of Lexington and Neo—in violation of Sections 206(1) and 206(2) of the Advisers Act.  We also

find that Respondents misrepresented the standard of care Harding would follow in selecting assets for Lexington and Neo in violation of Section 17(a)(2) of the Securities Act.[20]

### 1.    Fiduciary Duties to Advisory Clients

As discussed above, Sections 206(1) and 206(2) of the Advisers Act impose fiduciary duties on investment advisers.[21]  These fiduciary duties require the investment adviser "to act at all times in the best interest of the fund [it advises]."[22]  Harding breached its fiduciary duty to select only assets it believed were best for its clients in violation of Sections 206(1) and 206(2) when Chau purchased Norma BBB bonds as a favor to Magnetar and Merrill and Harding allocated those assets to Lexington and Neo without regard for those clients' interests.

The record establishes that Respondents did not view the Norma BBB bonds as a prudent investment.  Chau had emphatically declined the investment in the preceding weeks because Norma directed a relatively small amount of interest to mezzanine-level investors compared to a traditional amortization structure.  He agreed to purchase the BBB-rated tranche only at the behest of Merrill and Magnetar, who had been "very aggressive" in using their "clout" to "stuff people with" Norma BBBs and who had committed to "personally hammer" Chau to buy.  Even after receiving direct overtures from Merrill and Magnetar on January 23, 2007, Chau remained reluctant to invest in Norma BBBs, and cited Harding's "40mm single-As in Norma" to show he was a "team player!!!"  But on January 24, Chau ultimately succumbed to pressure from Merrill and Magnetar to purchase up to $20 million of Norma's BBB-rated tranche.  In sum, the record establishes that Respondents did not act in the best interest of Harding's clients when selecting the Norma BBBs for Lexington and Neo, but rather purchased the bonds as a favor to Merrill and Magnetar, and then unloaded the bonds into the Lexington and Neo portfolios.

Section 206(1) requires a showing of scienter, or intent to deceive, manipulate, or defraud.[23]  Extreme recklessness satisfies this scienter requirement.[24]  Here, Respondents

---

[20]    The ALJ found that any violations associated with Harding's purchase of Norma's A-rated tranche "were not sufficiently pled in the OIP."  Although we believe the Division adequately pled violations related to the A-rated tranche, we dismiss those charges because the record does not establish the alleged violations.  Chau committed to purchase the A-rated Norma bonds on his own initiative, at least several days before he received any pressure from Merrill and Magnetar, and he did not express any reluctance to purchase the A-rated bonds based on the "weak turbo structure" of the deal, as he did for the BBB-rated bonds.

[21]    *Transamerica Mortgage Advisers*, 444 U.S. at 17.

[22]    *SEC v. Tambone*, 550 F.3d 106, 146 (1st Cir. 2008), *withdrawn*, 573 F.3d 54 (2009), *reinstated in relevant part*, 597 F.3d 436 (2010).

[23]    *Steadman v. SEC*, 967 F.2d 636, 641 (D.C. Cir. 1992).

[24]    *Id.*

16

purchased assets for their clients that they admittedly viewed negatively. Indeed, Chau testified that he had agreed to purchase the BBB-rated bonds, at least in part, to "build goodwill" with Merrill and Magnetar and maintain that revenue stream. Respondents acted with at least an extremely reckless disregard for Harding's fiduciary obligations to its clients in violation of Section 206(1). Because a violation of Section 206(2) may rest on a finding of simple negligence,[25] and Respondents acted unreasonably in buying the Norma BBB bonds as a favor to Magnetar and Merrill, they also violated Section 206(2).

Respondents argue that they could not have defrauded the Lexington and Neo issuers because Section 206 addresses fraud on an investment adviser's clients and Lexington and Neo were essentially controlled by Merrill. Merrill created Lexington and Neo as special purpose vehicles ("SPVs") for the sole purpose of executing the deals and issuing the debt securities. It placed the same administrator and directors at the head of Lexington, Neo, and Norma, and they all shared the same address and phone number in the Cayman Islands. Moreover, Merrill pressured Harding to accept the Norma bonds and either knew or could have reasonably anticipated that Harding would incorporate those bonds into other Merrill-originated CDOs. Because, as a practical matter, Merrill controlled all aspects of the SPVs and the Lexington, Neo, and Norma deals, Respondents contend that they did not defraud or deceive the SPVs when they selected the Norma bonds under pressure from Merrill.

We reject this argument. First, Lexington and Neo are legally distinct entities and precedent supports observance of the corporate form.[26] Thus, despite the involvement of Merrill as the originator of the CDOs, Harding owed a fiduciary duty to the legally distinct SPVs and breached that duty when it purchased and allocated the Norma BBB bonds to Lexington and Neo as a favor to Magnetar and Merrill without regard for those clients' interests. Harding owed the SPVs the same duty of care that Harding owed any other advisory client, without regard to how the SPVs originated.

Second, Merrill's knowledge of Harding's reasons for selecting the Norma assets cannot be imputed to the SPVs' administrator or directors. Nothing in the record suggests that Respondents specifically disclosed to the Lexington or Neo issuers either that they believed that Norma had a very weak turbo structure that disfavored subprime investors or that they had reluctantly purchased the BBB-rated bonds they had selected to include in the portfolios as a favor to Merrill and Magnetar. Accordingly, the record does not establish, as argued by Respondents, that the SPVs could not have been defrauded because they were essentially controlled by Merrill.

---

[25]    *Id.* at 643 n.5.

[26]    *Cf. Janus Capital Grp., Inc. v. First Derivative Traders*, 564 U.S. 135, 145 (2011) ("We decline this invitation to disregard the corporate form.").

For these reasons, we find that Respondents acted with at least a reckless disregard for Harding's fundamental fiduciary duties to its clients in violation of Section 206.[27]

### 2.     Standard of Care for Selecting Assets

Respondents also violated Section 17(a)(2) of the Securities Act.  As discussed above, that section prohibits, in the offer or sale of securities, obtaining money or property by means of an untrue statement of material fact.  Here, the offering materials for the Lexington and Neo CDOs represented that Harding would exercise reasonable care in selecting assets and would do so in a manner "consistent with the customary standards, policies and procedures followed by institutional managers of national standing."  Regardless of the precise contours of this standard of care, we believe that, at a minimum, knowingly selecting poor investments to curry favor falls outside its scope.  The representation that Harding would select assets consistent with industry standards was therefore untrue.  We find further that this misrepresentation was material.  A reasonable investor would have wanted to know that instead of exercising reasonable care in selecting assets Harding selected assets based on its relationship with Magnetar and Merrill.  And Respondents obtained money or property by means of this material misrepresentation in the offering material because Harding made no money for managing a CDO unless and until the CDO closed.  Accordingly, we find that Respondents violated Securities Act Section 17(a)(2).[28]

### IV. Remedies

### A.     Bar from Association with an Investment Adviser.

Section 203(f) of the Advisers Act authorizes us to impose, among other sanctions, a bar from association with an investment adviser, broker, dealer, municipal securities dealer, or transfer agent[29] on any person who has willfully violated any provision of the Advisers Act or the Securities Act and who was associated with an investment adviser at the time of the

---

[27]     An associated person may be liable as a primary violator where, as here, the associated person controlled the investment adviser.  *Donald L. Koch*, Advisers Act Release No. 3836, 2014 WL 1998524, at *18 n.196, 21 (May 16, 2014), *petition denied in relevant part*, 793 F.3d 147 (D.C. Cir. 2015).  Chau was not only the controlling and majority shareholder of Harding, he directed Harding's purchase of the Norma BBB bonds.  Chau is therefore primarily liable for the violations of Advisers Act Sections 206(1) and (2) that Harding committed through his actions.

[28]     Although scienter is not required to establish a violation of Section 17(a)(2) of the Securities Act, s*ee Aaron*, 446 U.S. at 695–97, for the reasons discussed above, Respondents acted with scienter in misrepresenting the standard of care they used in selecting assets.

[29]     Although the Dodd-Frank Wall Street Reform and Consumer Protection Act of 2010 also authorized bars against municipal advisors and nationally recognized statistical ratings organizations, we do not impose such bars here because such bars may not be imposed based on conduct that predated Dodd-Frank.  *See Koch v. SEC*, 793 F.3d 147, 158 (D.C. Cir. 2015).

misconduct if we find such a bar to be in the public interest.[30]  In considering whether a bar is in the public interest, we consider "'the egregiousness of a respondent's actions, the degree of scienter involved, the isolated or recurrent nature of the infraction, the recognition of the wrongful nature of the conduct, the sincerity of any assurances against future violations, and the likelihood that the respondent's occupation will present opportunities for future violations.'"[31] Our inquiry into the public interest "is flexible, and no single factor is dispositive."[32]

In this case, the public interest factors weigh in favor of imposing a bar on Chau with a right to reapply in five years.  Chau violated his fiduciary obligations when he, acting on behalf of Harding, selected assets for Lexington and Neo that served Harding's interests, rather than those of Harding's clients.  Chau caused Harding to purchase Norma assets as a favor to Magnetar and Merrill and allocate those assets into the Lexington and Neo portfolios without regard for his clients' best interests.  In doing so, Chau acted with scienter.  His conduct also was inconsistent with the standard of care described to the investors in the offering materials of the Lexington and Neo CDOs.  Chau remains an investment adviser, with current assets under management of about $1 billion, which presents opportunities for violative conduct in the future. Indeed, the securities industry presents many opportunities for future violations, and Chau's continued employment in it in any capacity would pose a risk to investors.[33]  Because "'conduct that violates the antifraud provisions of the securities laws is especially serious and subject to the severest of sanctions under the securities laws,"[34] a bar with a right to reapply after five years is necessary to protect the public.[35]

---

[30]    *See* 15 U.S.C. § 80b-3(f) (referencing 15 U.S.C. § 80b-3(e)(5)).  "Willfully" in this context means intentionally committing the act that constitutes the violation.  *Wonsover v. SEC*, 205 F.3d 408, 414 (D.C. Cir. 2000.  Respondents' violations were willful.

[31]    *J.S. Oliver Capital Mgmt.*, Advisers Act Release No. 4431, 2016 WL 3361166, at *10 (June 17, 2016) (quoting *Robert L. Burns*, Advisers Act Release No. 3260, 2011 WL 3407859, at *8 (Aug. 8, 2011) (citing *Steadman v. SEC*, 603 F.2d 1126, 1140 (5th Cir. 1979))).

[32]    *Id.* (citing *Burns*, 2011 WL 3407859, at *8) (internal citation omitted).

[33]    *Conrad P. Seghers*, Advisers Act Release No. 2656, 2007 WL 2790633, at *7 (Sept. 26, 2007) (observing that the securities industry "presents continual opportunities for [similar] dishonesty and abuse, and depends heavily on the integrity of its participants and on investors' confidence"), *petition denied*, 548 F.3d 129 (D.C. Cir. 2008); *see also Charles Phillip Elliott*, Exchange Act Release No. 31202, 1992 WL 258850, at *3 (Sept. 17, 1992) (noting that the industry "presents many opportunities for abuse and overreaching"), *aff'd*, 36 F.3d 86 (11th Cir. 1994).

[34]    *Raymond J. Lucia Companies*, Advisers Act Release No. 4190, 2015 WL 5172953, at *24 (Sept. 3, 2015), *petition denied*, 832 F.3d 277 (D.C. Cir. 2016).

[35]    Section 9(b) of the Investment Company Act of 1940 authorizes us to impose a bar from association with a registered investment company on any person who has willfully violated the

**B.      Revocation of Registration**

Advisers Act Section 203(e) authorizes us to revoke an investment adviser's registration if we find that the investment adviser has willfully violated any provision of the Advisers Act or the Securities Act and revocation is in the public interest.[36]  We consider the same public interest factors discussed above in determining whether to revoke an investment adviser's registration.[37]  Chau is Harding's majority owner, chief executive officer, managing member, and chief compliance officer.  The firm is Chau's market vehicle.  The record amply supports revocation, for the reasons discussed above, as being necessary to protect the public interest.

**C.      Cease-and-Desist Order**

Section 8A of the Securities Act and Section 203(k) of the Advisers Act authorize us to issue a cease-and-desist order against any person that has violated those Acts.[38]  In determining whether a cease-and-desist order is appropriate, we consider the factors identified above as well as whether the violation is recent, the degree of harm to investors or the marketplace resulting from the violation, and the remedial function to be served by the cease-and-desist order.[39]  In this context, we also consider the risk of future violations.[40]

We disagree with respondents' argument that a cease-and-desist order is inappropriate because their conduct was not egregious, the violations were not recurrent and occurred many years ago, and no harm was caused to investors or the marketplace.  Although we require some likelihood of future violation before imposing such an order,[41] "a finding of [a past] violation raises a sufficient risk of future violation," because "evidence showing that a respondent violated the law once probably also shows a risk of repetition that merits our ordering him to cease-and-desist."[42]  In this case, Harding and Chau purchased the BBB-rated tranche of Norma and

---

Securities Act or the Advisers Act.  15 U.S.C. 80a-9(b)(2).  For the reasons discussed above, we bar Chau from association with a registered investment company with a right to reapply in five years.

[36]      *See* 15 U.S.C. § 80b-3(e).

[37]      *Lucia*, 2015 WL 5172953, at *26.

[38]      15 U.S.C. 77h-1; 15 U.S.C. 80b-3(k).

[39]      *Donald L. Koch*, Advisers Act Release No. 3836, 2014 WL 1998524, at *21 (May 16, 2014), *petition denied in relevant part*, 793 F.3d 147 (D.C. Cir. 2015).

[40]      *Id.*

[41]      *KPMG Peat Marwick LLP*, 54 S.E.C. 1135, 1185, Release No. 43862, 2001 WL 47245 (Jan. 19, 2001), *reconsideration denied*, Exchange Act Release No. 44050, 2001 SEC LEXIS 422 (Mar. 5, 2001), *reh'g denied*, 289 F.3d 109 (D.C. Cir. 2002).

[42]      *Id.*

allocated the bonds to Harding-managed CDOs notwithstanding their belief that the bonds would perform poorly. And they did so with scienter. For these reasons, as well as for the reasons discussed above with respect to the appropriateness of a bar from association and revocation of registration, we find cease-and-desist orders to be necessary to protect the investing public.

## D.     Disgorgement

Securities Act Section 8A(e), Advisers Act Section 203(j), and Investment Company Act Section 9(e) authorize us to impose disgorgement in this case.[43] Disgorgement is an equitable remedy that requires a violator to give up wrongfully obtained profits causally related to the proven wrongdoing.[44] It returns the violator to where he or she would have been absent the misconduct and deters others from violating the securities laws.[45] The amount of the disgorgement need only be a reasonable approximation of profits causally connected to the violation.[46] Once the Division shows that its disgorgement figure reasonably approximates the amount of unjust enrichment, the burden shifts to Respondents to demonstrate that the Division's disgorgement figure is not a reasonable approximation.[47] The consequence of uncertainty as to the disgorgement amount falls on the wrongdoer whose illegal conduct created the uncertainty.[48]

We order Respondents to disgorge all fees they earned for managing Lexington and Neo (a total of $5,775,635.61,[49] plus prejudgment interest).[50] Harding abdicated its fiduciary duties when it selected assets for Lexington and Neo that Chau had purchased as a favor to outside parties without regard (and, indeed, in apparent opposition to) the interest of Harding's clients; in doing so, Respondents knowingly put their interests ahead of their clients. Respondents also misrepresented in the offering documents for Lexington and Neo that they would exercise reasonable care in selecting assets and would select assets in a manner consistent with investment managers of national standing; instead, they selected assets in order to build goodwill with Merrill and Magnetar. Respondents failed to disclose this information in the offering

---

[43]      *See* 15 U.S.C. §§ 77h-1(e), 80a-9(e), 80b-3(j).

[44]      *See SEC v. First City Fin. Corp.*, 890 F.2d 1215, 1230-32 (D.C. Cir. 1989).

[45]      *Id.*; *see also Zacharias v. SEC*, 569 F.3d 458, 471 (D.C. Cir. 2009).

[46]      *See Laurie Jones Canady*, 54 S.E.C. 65, 84 n.35 (1999) (quoting *SEC v. First Jersey Sec., Inc.*, 101 F.3d 1450, 1475 (2d Cir. 1996)), *petition denied*, 230 F.3d 362 (D.C. Cir. 2000).

[47]      *Guy P. Riordan*, Securities Act Release No. 9085, 2009 WL 4731397, at *20 (Dec. 11, 2009), *petition denied*, 627 F.3d 1230 (D.C. Cir. 2010).

[48]      *See First City Fin. Corp.*, 890 F.2d at 1232.

[49]      Harding received $1,285,112.77 in fees for Lexington and $4,490,522.84 in fees for Neo.

[50]      Because Harding and Chau collaborated and had a close relationship in engaging in the illegal conduct, we believe joint and several liability for the disgorgement amount is appropriate. *See SEC v. Whittemore*, 659 F.3d 1, 10–11 (D.C. Cir. 2011).

21

documents for Lexington and Neo, thus depriving Lexington's and Neo's investors of the opportunity to withdraw from the relationship prior to closing. As discussed above, Harding received no fees unless and until a CDO closed. For these reasons, all fees Respondents received for managing Lexington and Neo are causally connected to Respondents' misconduct and should be disgorged as ill-gotten gains.

**E.    Civil Penalties**

Securities Act Section 8A(g), Advisers Act Section 203(i), and Investment Company Act Section 9(d) authorize the imposition of civil penalties in this case.[51] In considering whether a civil penalty is in the public interest, we consider (i) whether the act or omission involved fraud; (ii) whether the act or omission resulted in harm to others; (iii) the extent to which any person was unjustly enriched; (iv) whether the respondent committed previous violations; (v) the need to deter such persons and others from committing violations; and (vi) such other matters as justice may require.[52] Second-tier penalties require that the "act or omission involved fraud, deceit, manipulation, or deliberate or reckless disregard of a regulatory requirement."[53] Third-tier penalties require that in addition the "act or omission directly or indirectly resulted in substantial losses or created a significant risk of substantial losses to other persons or resulted in substantial pecuniary gain to the person who committed the act or omission."[54] The Division requests third-tier penalties. Respondents argue that a penalty is not in the public interest and a third-tier penalty is not appropriate because Lexington and Neo could have closed even without the Norma bonds so there was no "substantial pecuniary gain."

We find that the elements required to impose third-tier penalties have been met, irrespective of whether Respondents' pecuniary gain was substantial, because the violations involved fraud and created a significant risk of substantial losses to other persons. Because the BBB-rated Norma bonds had an extremely high risk of default, and including them in the Lexington and Neo portfolios increased the risk that the entire pool of assets would default, Respondents' violations increased the risk that the debt investors in those CDOs (especially the subprime debt investors) would lose their investments. Respondents' scienter in committing the violations, their unjust enrichment, and the need for deterrence also weigh in favor of a substantial civil penalty. The factors weighing against a third-tier penalty include the lack of losses or other harm directly caused by the violation (due to the small percentage of Norma bonds relative to the rest of the Neo and Lexington portfolios).

---

[51]    15 U.S.C. 77h-1; 15 U.S.C. § 80a-9(d); 15 U.S.C. § 80b-3(i).

[52]    15 U.S.C. § 80b-3(i)(3).

[53]    15 U.S.C. § 80b-3(i)(2).

[54]    *Id.*

22

Based on these factors, we agree with the ALJ, based on our de novo review, that a civil penalty of about two-thirds of the maximum is appropriate as to each Respondent. Therefore, we order Harding to pay two penalties of $425,000 each, or $850,000 total, and Chau to pay two penalties of $85,000 each, or $170,000 total. These penalties consist of one third-tier penalty for the violations with respect to Lexington and one third-tier penalty for the violations with respect to the Neo, with each penalty set at two-thirds of the maximum third-tier amount.

### V. Constitutional Arguments

Respondents have raised a number of constitutional claims, both before the ALJ and before us on appeal. We find these claims to be without merit.[55]

**A.    Respondents' due process challenges lack merit**

Respondents first attack the Commission's administrative proceedings and the hearing process on general, structural grounds. They argue, for example, that "[a]s employees of the Commission . . . ALJs cannot be expected to be as hard on their colleagues at the Division as they can be on Respondents and their counsel." We have observed before that such "attacks on the procedures of the administrative process have been repeatedly rejected by the courts," and see no reason to revisit that conclusion.[56] As the Supreme Court has made clear, the "combination of investigative and adjudicative functions" in an agency does not "create[] an unconstitutional risk of bias in administrative adjudication," "violate the Administrative Procedure Act," or "violate due process of law."[57] Likewise, the inapplicability of the Federal Rules of Civil Procedure and Federal Rules of Evidence to our administrative proceedings is not a violation of due process.[58]

Respondents themselves recognize in their reply brief that the "combination of adjudicatory and investigatory functions" in an agency does not itself violate due process. They argue instead that our purported failure to "follow [Congress's] statutory commands" as to the

---

[55]    Because Respondents' claims fail as a matter of law, or otherwise can be resolved on the basis of the present administrative record, we find that the ALJ correctly denied Respondents' requests for discovery with respect to these claims and see no need for additional evidence to be adduced. *Cf.* Rule of Practice 452, 17 C.F.R. § 201.452; *John Thomas Capital Mgmt. Grp.*, Exchange Act Release No. 31462, 2015 WL 728006, at *3 (Feb. 20, 2015).

[56]    *See, e.g.*, *Harding Advisory LLC*, Exchange Act Release No. 30892, 2014 WL 988532, at *8 (Mar. 14, 2014) (citation omitted).

[57]    *Withrow v. Larkin*, 421 U.S. 35, 47, 56 (1975).

[58]    *See, e.g.*, *Bernard E. Young*, Exchange Act Release No. 774421, 2016 WL 1168564, at *19 n.84 (Mar. 24, 2016); *Del Mar Fin. Servs., Inc.*, Exchange Act Release No. 48691, 2003 WL 22425516, at *8 (Oct. 24, 2003).

"manner in which the ALJs are appointed" has "upend[ed] [the] Congressional balancing of due process interests and creates a constitutionally impermissible risk of a biased outcome." We have rejected challenges to the appointment of Commission ALJs elsewhere, and do so again here.[59]

Respondents next argue that the ALJ made rulings and conducted the hearing in a manner that evidences bias. We have previously rejected the argument that the ALJ who presided over the hearing in this matter is biased against Respondents as a class or otherwise lacks impartiality.[60] ALJs are presumed to be unbiased,[61] and to overcome this presumption, the party claiming bias must establish a "conflict of interest or some other specific reason for disqualification,"[62] such as where the law judge's behavior, "in the context of the whole case, was 'so extreme as to display clear inability to render fair judgment.'"[63] Mere disagreement with "judicial rulings alone almost never constitute a valid basis" for a claim of bias.[64] Based on our independent, de novo review of the record, we are satisfied that the ALJ acted appropriately.

For example, Respondents take issue with the ALJ's decision to deny them a six-month continuance to review the investigative file. We do not believe that this ruling constituted an "unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay."[65] Although voluminous, the investigative file was produced to Respondents in the manner in which it was maintained by the Division and, for the most part, in an electronically searchable format. Further, Respondents have been represented by experienced counsel since 2010, three years before the Commission instituted proceedings. The ALJ was not required to grant an extended continuance to accommodate their eleventh-hour decision to retain new counsel after the institution of proceedings.[66] Considering all the circumstances, we find that, as

---

[59]     *See infra* 0.

[60]     *Timbervest, LLC*, Advisers Act Release No. 4197, 2015 WL 5472520, at *21–22 (Sept. 17, 2015), *petition for review filed*, No. 15-1416 (D.C. Cir. Nov. 13, 2015).

[61]     *See, e.g.*, *Schweiker v. McClure*, 456 U.S. 188, 195 (1982); *Withrow*, 421 U.S. at 47.

[62]     *Schweiker*, 456 U.S. at 195.

[63]     *Rollins v. Massanari*, 261 F.3d 853, 858 (9th Cir. 2001) (quoting *Liteky v. United States*, 510 U.S. 540, 551 (1994)); *accord Keith v. Barnhart*, 473 F.3d 782, 788 (7th Cir. 2007).

[64]     *Liteky*, 510 U.S. at 555; *Marcus v. Dir., Office of Workers' Comp. Programs*, 548 F.2d 1044, 1051 (D.C. Cir. 1976).

[65]     *Morris v. Slappy*, 461 U.S. 1, 11–12 (1983) (internal quotation marks omitted); *Gregory M. Dearlove*, Exchange Act Release No. 57244, 2008 WL 281105, at *35 (Jan. 31, 2008).

[66]     *See, e.g.*, *United States v. Whitehead*, 487 F.3d 1068, 1071 (8th Cir. 2007); *United States v. Todisco*, 667 F.2d 255, 261 (2d Cir. 1981).

due process requires, Respondents had a sufficient understanding of the matters in dispute, the relevant evidence, and a meaningful opportunity to prepare and present a defense.

Likewise unavailing is Respondents' contention that the ALJ failed to police the Division's compliance with its disclosure obligations under Rule of Practice 230, which provides that the Division may not withhold *Brady* material from its investigative file.[67]  As noted above, it is undisputed that the Division produced the investigative file at the outset of proceedings. Contrary to Respondents' submission, the Division was not obliged to direct them "to specific items of potentially exculpatory evidence within [that] larger body of disclosed material" or provide a "roadmap" for Respondents to most efficiently employ those documents.[68]  Even in the criminal context, it is settled that an "open file" production satisfies the government's disclosure obligations and does not violate the defendant's due process rights.[69]

We also dismiss all of Respondents' specific *Brady* allegations.  Most of Respondents' *Brady* allegations relate to the Division's disclosures for Octans, such as the timing of expert report disclosures, and are moot in light of our decision to dismiss the Octans-related claims on the merits.[70]  As to Norma, we reject Respondents' argument that the Division withheld *Brady* material regarding whether Merrill knew Harding had caved to pressure and bought the BBB Norma bonds to curry favor with Merrill and Magnetar.  Respondents claim that the Division waited until after the ALJ issued his initial decision and the record was closed to admit that Merrill did not know that it was being accommodated.  In support of this argument, Respondents point to the Division's answering brief on appeal, in which the Division stated that Merrill did not know that it was being accommodated.  This is not evidence within the meaning of *Brady* that must be disclosed in advance, but rather the litigation position of the Division on appeal.[71]

---

[67]     17 C.F.R. § 201.230.  Under *Brady v. Maryland*, 373 U.S. 83 (1963), the prosecution in a criminal proceeding must disclose materially exculpatory or impeaching evidence to the defendant.  *Brady* has no direct application to our administrative proceedings. *optionsXpress, Inc.*, Exchange Act Release No. 70698, 2013 WL 5635987, at *3 & n.15 (Oct. 16, 2013).

[68]     *John Thomas Capital Mgmt. Grp.*, Exchange Act Release No. 30820, 2013 WL 6384275, at *6 (Dec. 6, 2013).

[69]     *See id.* (collecting cases).

[70]     *See Kyles v. Whitley*, 514 U.S. 419, 434 (1995) (holding that *Brady* claims require a showing of materiality and prejudice).  Our disposition of the remainder of this appeal also moots Respondents' other due process claims regarding Octans.

[71]     *optionsXpress*, 2013 WL 5635987, at *7 (explaining that a defendant "may be entitled to all exculpatory evidence," but he or she is not entitled to know "what attorneys at the SEC *think* about such evidence") (quoting *SEC v. Reyes*, 2007 WL 528718, at *4 (N.D. Cal. Feb. 13, 2007)); *accord United States v. Coker*, 514 F.3d 562, 570 (6th Cir. 2008) ("*Brady* obligates the

25

The third and final category of Respondents' claims are cast in due process terms but are in substance challenges to the ALJ's evidentiary rulings or weighing of the evidence.[72]  And our review is *de* novo and plenary as to evidentiary rulings, as well as to factual findings and legal conclusions; accordingly, we are not bound by the ALJ's decisions regarding which witnesses' testimony to credit or what documentary evidence to rely on.[73]  We have made our own findings and conclusions based on the record as reflected elsewhere in this opinion.

In short, we find that Respondents received a full and fair opportunity to prepare and present their defense before a neutral adjudicator, free from the appearance of bias or impartiality.  We reject Respondents' due process claims in their entirety.

## B.    Respondents' equal protection claim lacks merit

In a footnote to their supplemental brief, Respondents reference the claim they pressed before the ALJ and in a prior interlocutory appeal that the Commission violated their right to equal protection by bringing this matter as an administrative proceeding rather than bringing suit in federal district court.  Respondents have failed to preserve this claim because they failed to develop it in either their merits briefs or their supplemental briefs to the Commission.[74]  And we are unpersuaded by Respondents' attempt to excuse the conclusory and summary fashion in which they have presented certain arguments by citing the "number and complexity of issues" in this case.  The "process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail . . . is the hallmark of effective appellate advocacy."[75]  Our Rules of

---

government to disclose evidence favorable to the accused," but does not "obligate the government to give the defendant legal theories.") (quotation marks omitted).

[72]    *Chen v. Lynch*, 621 F. App'x 684, 686 (2d Cir. 2015) ("Although [the respondent] employs the rhetoric of a constitutional issue by styling this as a 'due process claim,' he is really challenging the weight accorded the evidence, *i.e.*, he argues that the agency should have credited one part of his testimony over another."); *Mehilli v. Gonzales*, 433 F.3d 86, 94 (1st Cir.2005) (explaining that arguments that the hearing officer "incorrectly weighed the evidence, failed to explicitly consider certain evidence, or simply reached the wrong outcome . . . are not properly viewed as constitutional challenges at all").

[73]    *Michael Lee Mendenhall*, Exchange Act Release No. 74532, 2015 WL 1247374, at *1 (Mar. 19, 2015).

[74]    *See, e.g.*, *Anthony Fields*, Exchange Act Release No. 74344, 2015 WL 728005, at *19 & n.115 (Feb. 20, 2015) (explaining that "arguments for reversal not made in the opening brief" may be deemed waived); *John Thomas Capital Mgmt. Grp.*, Exchange Act Release No. 74100, 2015 WL 242391, at *1 (Jan. 20, 2015) (explaining that the Commission is not obliged "to identify and develop arguments that a party fails to advance with clarity.").

[75]    *Smith v. Murray*, 477 U.S. 527, 536 (1986) (quotation marks omitted).

Practice do permit filings to be incorporated by reference in some circumstances,[76] but construing Respondents' prior filings as incorporated by reference here would allow them to circumvent length limitations that the Commission has already declined to relax.[77] These length limitations are routine and akin to those "strictly, and cheerfully, enforced" by courts.[78]

In any event, Respondents' equal protection claim fails on the merits. We have held previously that proceeding against a respondent in an administrative proceeding rather than in federal court does not violate equal protection.[79] We adhere to those decisions here.[80]

## C.    Respondents' challenges to appointment of Commission ALJs are unpersuasive

Respondents argue that the ALJ who presided over this matter was not appointed in a manner consistent with the Appointments Clause of Article II of the Constitution or applicable statutory provisions.[81] We have rejected similar claims before and again do so here.[82]

Recently, the D.C. Circuit confirmed in *Raymond J. Lucia Companies v. SEC* that our ALJs are employees, not constitutional Officers, and thus their manner of appointment is not subject to the requirements of the Appointments Clause. The D.C. Circuit, relying on *Landry v. FDIC*,[83] rejected squarely the contention that the Commission's ALJs are "constitutional

---

[76]    *See* Rule of Practice 450(c), 17 C.F.R. § 201.450(c).

[77]    *Harding Advisory LLC*, Exchange Act Release No. 31500, 2015 WL 1004879, at *1 (Mar. 9, 2015).

[78]    *Watts v. Thompson*, 116 F.3d 220, 224 (7th Cir. 1997); *accord May v. Shinseki*, 544 F. App'x 1002, 1005 (Fed. Cir. 2013); *Weeks v. Angelone*, 181 F.3d 557, 583 (4th Cir. 1999).

[79]    *Timbervest*, 2015 WL 5472520, at *28–30.

[80]    As with Respondents' due process claims, we find that an adequate record for review exists and so deny Respondents' requests for discovery.

[81]    Respondents filed a Motion to Submit Supplemental Briefing regarding their Appointments Clause claims. The motion does not contain the required certificate of compliance and exceeds the length limitation specified in Rule of Practice 154(c). 17 C.F.R. § 201.154(c). The Motion is stricken pursuant to Rule of Practice 180(b). *Id.* § 201.180(b). Nevertheless, and in the alternative, we have considered and rejected the arguments contained therein.

[82]    *See, e.g.*, *Timbervest*, 2015 WL 5472520, at *23–25; *Lucia*, 2015 WL 5172953, at *21–23. In a footnote, Respondents also assert that the manner of removing ALJs is unconstitutional in light of the Supreme Court's decision in *Free Enterprise Fund v. PCAOB*. We have also rejected this argument. *See, e.g.*, *Timbervest*, 2015 WL 5472520, at *26–28.

[83]    204 F.3d 1125 (D.C. Cir. 2000) (holding that, for purposes of the Appointments Clause, ALJs at the Federal Deposit Insurance Corporation ("FDIC"), who oversee the FDIC's contested administrative proceedings, are employees rather than inferior officers).

27

Officer[s] who must be appointed pursuant to the Appointments Clause."[84]  *Lucia* held that the "FDIC regime considered in *Landry*" does not differ in any material way from the regulatory regime governing our ALJs.[85]

As *Lucia* explained, "nothing in the securities laws . . . suggests Congress intended that Commission ALJs be appointed as if [constitutional] Officers."[86]  That the federal securities laws specify that only the Commission and "officers of the Commission designated by it" may exercise certain functions, such as issuing subpoenas and holding hearings,[87] is irrelevant.  There is "no indication Congress intended these officers to be synonymous with 'Officers of the United States' under the Appointments Clause."[88]  Identical reasoning disposes of Respondents' contention that we failed to adhere to our organic statutes or the Administrative Procedure Act, by authorizing ALJs, who are mere employees, to preside over our administrative proceedings.[89]  The legislative history that Respondents cite does not undermine the analysis of the D.C. Circuit.  We accordingly reject Respondents' challenges to the manner of appointment of our ALJs.[90]

---

[84]    832 F.3d 277, 280 (D.C. Cir. 2016).

[85]    *Id.* at 288.

[86]    *Id.* at 289.

[87]    *See, e.g.*, 15 U.S.C. §§ 77s(c), 77u.

[88]    *Lucia*, 832 F.3d at 289.

[89]    We have also noted "that the Administrative Procedure Act "consistently uses the term 'officer' or the term 'officer, employee, or agent' to 'refer to [agency] staff members.'"  *Timbervest*, 2015 WL 5472520, at *26 n.165 (quoting Kenneth Culp Davis, *Separation of Functions in Administrative Agencies*, 61 HARV. L. REV. 612, 615 & n.11 (1948)); *cf.* 5 U.S.C. §§ 556-57 (referring to official who presides over hearing as the "presiding employee").  Moreover, the Dictionary Act provides an interpretive presumption that the term "'officer' includes any person authorized by law to perform the duties of the office."  1 U.S.C. § 1.

[90]    On December 27, 2016, the Tenth Circuit held that "SEC ALJs are inferior officers under the Appointments Clause."  *SEC v. Bandimere*, __ F.3d __, 2016 WL 7439007, at *7 (10th Cir. Dec. 27, 2016).  The government is considering options for further review.  In this case, the record indicates that Respondents may appeal to the D.C. Circuit but not to the Tenth Circuit.  *See* 15 U.S.C. 78y(a).  Accordingly, we adhere to the D.C. Circuit's decision in *Lucia*.  *See Indep. Petroleum Ass'n v. Babbitt*, 92 F.3d 1248, 1261 (D.C. Cir. 1996) (acknowledging the permissibility of "intercircuit nonacquiescence . . . , especially when the law is unsettled"); Samuel Estreicher and Richard Revesz, *Nonacquiescence by Federal Administrative Agencies*, 98 YALE L.J. 679, 687, 735 (1989) (stating that an agency engages in "intercircuit nonacquiescence" by declining to follow "the case law of a court of appeals other than the one that will review the agency's decision" and that "an agency's ability to engage in intercircuit nonacquiescence should not be constrained").

28

## VI. Conclusion

We dismiss the charges regarding Octans. We find that Respondents violated Section 206(1) and (2) of the Advisers Act and Section 17(a) of the Securities Act in purchasing and allocating BBB-rated Norma bonds to two Harding-managed CDOs. We bar Chau, revoke Harding's registration, and impose a cease-and-desist order, disgorgement, and civil penalties.

An appropriate order will issue.[91]

By the Commission (Chair WHITE and Commissioners STEIN and PIWOWAR).

Brent J. Fields
Secretary

---

[91]     We have considered all of the parties' contentions. We have rejected or sustained them to the extent that they are inconsistent or in accord with the views expressed in this opinion.

# **EXHIBIT B**

UNITED STATES OF AMERICA
before the
SECURITIES AND EXCHANGE COMMISSION

SECURITIES ACT OF 1933
Release No. 10277 / January 6, 2017

INVESTMENT ADVISERS ACT OF 1940
Release No. 4600 / January 6, 2017

INVESTMENT COMPANY ACT OF 1940
Release No. 32415 / January 6, 2017

---

In the Matter of

HARDING ADVISORY LLC and
WING F. CHAU

---

ORDER IMPOSING REMEDIAL SANCTIONS

On the basis of the Commission's opinion issued this day, it is

ORDERED that Respondents Harding Advisory LLC ("Harding") and Wing F. Chau ("Chau") cease and desist from committing or causing any violations or future violations of Section 17(a) of the Securities Act of 1933 and Sections 206(1) and (2) of the Investment Advisers Act of 1940; and it is further

ORDERED that Harding and Chau pay $5,775,635.61 in disgorgement, jointly and severally, plus prejudgment interest of $2,780,380.78, such prejudgment interest calculated beginning from March 1, 2007, in accordance with Commission Rule of Practice 600; and it is further

ORDERED that Harding pay a civil money penalty in the amount of $850,000; and it is further

ORDERED that Chau pay a civil money penalty in the amount of $170,000; and it is further

ORDERED that Harding's investment adviser registration is revoked; and it is further

ORDERED that Chau is barred from association with an investment adviser, broker, dealer, municipal securities dealer, or transfer agent (with a right to reapply after five years); and it is further

2

ORDERED that Chau is prohibited from serving or acting as an employee, officer, director, member of an advisory board, investment adviser or depositor of, or principal underwriter for, a registered investment company or affiliated person of such investment adviser, depositor, or principal underwriter (with the right to reapply after five years).

Payment of the amounts to be disgorged and the civil money penalties shall be: (i) made by United States postal money order, certified check, bank cashier's check, or bank money order; (ii) made payable to the Securities and Exchange Commission; (iii) mailed to Enterprise Services Center, Accounts Receivable Branch, HQ Bldg., Room 181, 6500 South MacArthur Blvd., Oklahoma City, OK 73169; and (iv) submitted under cover letter that identifies the Respondents and the file number of this proceeding.

By the Commission.

Brent J. Fields
Secretary